# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CHARLES C. KRETEK, as personal
representative of CHRISTOPHER
APARICIO, deceased,

        Plaintiff,

        vs.                      No. CIV 2011-676-RB/GBW

BOARD OF LUNA COUNTY
COMMISSIONERS, et al.,

        Defendants.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendants Board of County Commissioners of Luna County, John Krehbiel, Yolanda Edwards and Josh Elford have moved for summary judgment on all of the Plaintiff's claims against them.[1] The Plaintiff has brought six separate counts against the Defendants, two under state law and four under 42 U.S.C. §1983. All of the Plaintiff's claims arise from a March 3, 2011, incident at the Luna County Detention Center (LCDC) which resulted in the Plaintiff's death.

### Plaintiff's Response to Defendants' Statement of Undisputed Facts

1.     Plaintiff admits that Christopher Aparicio was under the influence of methamphetamine on March 3, 2011, and exhibited signs of paranoia to the police officer after

---

[1]Defendant Jonathan Chavez is not a party to the Defendants' summary judgment motion although that motion asks this Court to dismiss Plaintiff's claims against Defendant Chavez for an alleged failure to serve Mr. Chavez with process within the time allowed for under Federal Rule Civil Procedure 4(m). The Defendants' request for the dismissal of Plaintiff's claims against Defendant Chavez is not well taken. The Plaintiff's Second Amended Complaint was filed on October 31, 2012. The Plaintiff therefore has until February 28, 2012, to effect service on Defendant Chavez under Rule 4(m).

he had turned himself in.  Plaintiff denies that Exhibit A to Defendants' motion supports the Defendants' factual contention that the Plaintiff  "began hallucinating".

2.      Plaintiff denies Defendants' Undisputed Fact number 2.  The Plaintiff was determined to have violated the terms of his parole after he admitted to using methamphetamine on the morning of March 3, 2011.  Plaintiff's use of methamphetamine constituted a violation of the conditions of his parole, not his "drug abuse" as alleged by Defendants.  Exhibit A to Defendants' Summary Judgment Motion.

3.      Plaintiff admits Defendants' Undisputed Fact number 3.

4.      In response to Defendants' Undisputed Fact number 4, Plaintiff admits the Plaintiff became agitated and uncooperative during the booking process at the Luna County Detention Center, and the booking officer called for the assistance of one detention officer, not multiple officers, after the Plaintiff became agitated over the prospect of having his photograph taken.  Exhibit 2, deposition of Jessica Quintana.  The remainder of the events that occurred in the booking area are set forth in the Plaintiff's Statement of Additional Material Facts.

5.      In response to Defendants' Undisputed Fact number 5, Plaintiff admits most of the Defendants' restraint of the Plaintiff occurred outside the view of the surveillance camera and is not shown on Defendants' Exhibit C.

6.      Plaintiff admits Defendants' Undisputed Fact 6.

**Plaintiff's Response to Other Factual Contentions**
**Contained in the Defendants' Motion**

The Defendants' motion relies on a number of factual assertions which are not contained in the Defendants' Statement of Undisputed Facts, and which do not refer with particularity to

the portions of the records upon which the Defendants rely to support those factual assertions as required by D.N.M.LR.Civ. 56.1(b). Plaintiff responds to those facts as follows:

7. Plaintiff denies Defendants' claim that the asserted lack of urgency demonstrates the Plaintiff was not in medical distress during his contact with the Defendants. The lack of urgency shown by some detention officers in Exhibit C including Defendants McGrael and Edwards could also be reasonably interpreted as a lack of concern for the Plaintiff's life and safety.

8. The video tape is not an undisputed fact and is subject to different subjective interpretations. *See*, Defendants' Exhibit C.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1. On March 3, 2011, Plaintiff Christopher Aparicio turned himself into Deming police, told them he had taken methamphetamine earlier that day, and provided them the name of his probation officer. Defendants' Exhibit A. Mr. Aparicio was cooperative when police arrived, going so far as to ask to sit in the police car. *Id.* Mr. Aparicio's use of methamphetamine was determined to be a violation of the terms of his probation and he was taken to a local hospital to be medically cleared before being taken to Luna County Detention Center (LCDC). *Id.*

2. Upon examination at the hospital, Plaintiff was cooperative and not agitated, his airway was clear, respiratory effort unlabored, his respiratory system and heart were normal and the Plaintiff had no conditions that could cause a collapsed lung. Exhibit 1 at pp. 44-47 and exhibit thereto. He had no bruises or abrasions on his forehead, temple or wrists, was medically cleared to be incarcerated, *id.,* and entered LCDC at 11:19 p.m., on March 3, 2011. Exhibit 3.

3

3.      Approximately thirty six minutes later, Plaintiff had a collapsed lung (tension pnuemothorax), brain anoxia (global hypoxia/ischemia) and cardio-pulmonary arrest, after having been positionally asphyxiated by LCDC guards.  Dkt 152-4 (EMTS arrived at LCDC booking area at 23:52); Exhibit 4, OMI report at p. 5; Exhibit 5.  Plaintiff was removed from LCDC to a Las Cruces hospital where he died two weeks later.  Exhibit 4 at p. 5.  The manner of his death was homicide and the cause of his death was positional asphyxia.  Exhibit 6, Spitz report.  Plaintiff occupied the status of a pre-trial detainee while in the custody of LCDC on March 3 and 4, 2011, when he was admitted to the jail after being arrested on a probation violation for which he had not been found guilty of.  Defendants' Exhibit A.

4.      Plaintiff was cooperative when he arrived at LCDC, and when he was placed into a three foot by three foot booking cage in LCDC's booking area by booking officer Quintana.[2] Exhibit 2 at 17; Exhibit 7, Elford deposition 70.  LCDC's medical officer, Defendant McGrael, and the booking officer knew Plaintiff was under the influence of methamphetamine and that Plaintiff had been brought to jail on a probation violation but did not inform other LCDC staff of Plaintiff's methamphetamine intoxication.  Exhibit 8, McGrael deposition at p. 25; Exhibit 10, Quintana DPS interview at p. 13; Exhibit 9, Loya DPS interview at pp. 3-4; Exhibit 10, Quintana DPS interview at p. 4; Exhibit 13, Keickbush expert report at p. 5.

5.      If persons in LCDC custody are intoxicated and non-compliant in booking, LCDC's practice was to place the individual in a holding cell until they sobered up, and then

_____

[2]Despite believing LCDC would be sued for the events leading to Plaintiff's death almost immediately after they occurred, LCDC failed to preserve video of the Plaintiff's arrival and his being escorted to the booking cage.   Exhibit 29, Krehbiel deposition at p. 94.  Plaintiff was cooperative this entire time.

complete the booking process. Exhibit 8 at 28-30. The Defendants did not place Plaintiff in a holding cell even though the booking officer suggested that the Plaintiff be placed in a holding cell until he sobered up. Exhibit 2, pp. 23-24. Instead, detention officer/medical officer Defendant McGrael instructed guards complete the booking process. Exhibit 11, McGrael DPS interview at 4.

6.     The booking officer noticed that the cage was too small for the Plaintiff and that the Plaintiff started to become agitated after being placed in the cage. Exhibit 10 at p. 5. Exhibit 13 at p. 7. The Plaintiff began asking why he was in jail and told officer Quintana he needed to get out of the cage. Exhibit 10 at p. 5. When told he needed to have his photograph taken, Plaintiff began to display overt signs of acute intoxication and mental disturbance, asking guards over and over again why he was in jail and what had he done to be in jail, despite the fact he had just turned himself in. Exhibit 12, Gallegos deposition at p. 48; Exhibit 13 at pp. 4-5; Exhibit 16, Barshaw deposition at pp. 19-20. The booking officer's efforts to calm the Plaintiff down and get his picture taken were not successful. Exhibit 10 at pp. 4-6.

7.     The presence of people entering Luna County Detention Center intoxicated on drugs and/or who are mentally disturbed is a recurring event at LCDC. Exhibit 14, Edwards deposition at p. 36. Jail employees are trained to be nice to such people and not shout orders at them so as not to 'set them off.' *Id.* at pp. 37-38; Exhibit 15, Baeza deposition at pp. 14-15. LCDC had a policy and practice that if a person in its custody refused to obey an order, or was non-compliant, detention officers are supposed to calm the inmate down, stay calm themselves, not yell at an inmate or escalate the situation, and if unsuccessful, should call their on duty supervisor or officer in charge. Exhibit 15 at pp. 14-15; Exhibit 14 at pp. 37-38.

8.      Defendant Edwards was the supervisor on duty on March 3, 2011, but was not called by any detention officers to assist in de-escalating Plaintiff.  Exhibit 14 at pp. 23, 66. Instead, the booking officer called for the assistance of one guard to stand by while Plaintiff was escorted to have his photograph taken.  Exhibit 2 at p. 26.

9.      Several guards, including Defendants Elford and Chavez, quickly entered the booking area and gathered in front of the cage.  Defendants' Exhibit C at 12:55 to 14:03; Exhibit 14 at p. 61.  Defendant Elford told the Plaintiff several times that he needed to have his picture taken.  Exhibit 7 at pp. 51-52; Exhibit 16 at 18-20.  The Plaintiff agreed to have his picture taken but would change his mind and refuse to have his picture taken.  Exhibit 7 at pp. 51-53.  This caused Defendant Elford to become agitated and to begin yelling at the Plaintiff.  Exhibit 16 at pp. 18-20.  LCDC guards were trained to de-escalate an inmate in situations where inmates says OK and then say 'no'. Exhibit 12 at pp. 67-68; Exhibit 15 at pp. 14-15.  Contrary to LCDC training Defendant Elford escalated the situation by becoming agitated himself after the Plaintiff repeatedly said he would have his picture taken but would not move, and began loudly ordering the Plaintiff to have his picture taken.  Exhibit 16 at pp. 18-20.  Defendant Elford did not call his supervisor when his efforts to de-escalate the situation were unsuccessful, again contrary to LCDC policy.  Exhibit 14 at p. 66.

10.      After several back and forths about whether the Plaintiff would have his picture taken, Defendant Elford unlocked and opened the door to Plaintiff's cage where he had been safely confined.  The Plaintiff did not pose a risk to the guards while locked in his cage.  Exhibit 20 at p. 72.  Elford DPS interview 3, Exhibit 7 at pp. 53-54.  When Defendant Elford opened the door to the booking cage, Plaintiff was not combative, and instead started to 'freak out' and

6

"shook his arms around" as if he were scared. Exhibit 9 at pp. 4, 6-7; Exhibit 17, Chavez DPS interview at 3. Plaintiff became hesitant, initially refused to exit the cage, and then walked out of the cage but started backing up and looked startled. Exhibit 7 at p.55; Exhibit 18, Elford report. Plaintiff's actions did not cause Defendant Elford to fear for his safety, as the Plaintiff was "kind of cautious" and kept saying 'Yes' when asked if he would agree to have his picture taken, but would not move physically. Exhibit 7 at p. 56.

11. After Defendant Chavez entered the booking area, Defendant Elford unsuccessfully tried to restrain the Plaintiff in a one man escort position, causing the Plaintiff to pull away and try to get back in the booking cage. *Id.* at pp. 56-58; Defendants' Exhibit C at 13:50. Defendant Chavez then charged the cage and tried to cuff Plaintiff behind his back causing the Plaintiff to again retreat into the booking cage, grabbing Chavez' shirt and pulling Chavez into the cage with him. Exhibit 7 at pp. 65-66; Exhibit 17 at pp. 5-6. Defendant Elford could not close the door to Plaintiff's cage because Defendant Chavez was in the cage. Exhibit 7 at pp. 65-66. Defendant Elford easily separated the Plaintiff and Defendant Chavez by placing his arm under Plaintiff's arm that was grabbing a hold of Defendant Chavez's shirt and "at that point he [Plaintiff] just let go", and Elford pulled Chavez out of the cage. *Id.* at 67. The Plaintiff never struck any detention officer. *Id.* 57-58, 65, 67; Exhibit 17 at p. 4; Exhibit 13 at p. 7. Both Defendant Chavez and Defendant Elford's efforts to restrain the Plaintiff resulted in the Plaintiff retreating back into the cage. Exhibit 7 at pp. 58, 65.

12. While the Plaintiff was inside the booking cage, Defendant Elford drew his Taser. Defendants' Exhibit C at 14:30; Exhibit 7 at p. 72. Elford told the Plaintiff he would be Tased if he did not comply with the order to sit down. *Id.* at 73-74. When Elford ordered the Plaintiff to

sit down or be Tased, the Plaintiff did not seem to grasp Elford's statement that he was going to Tase the Plaintiff, Exhibit 10 at p. 6, and remained in the same position. Exhibit 7 at pp. 73-74. Elford then Tased Plaintiff three times in rapid succession with 1 or 2 seconds between applications. *Id.* at pp. 75-76; Exhibit 19, Taser video. Plaintiff screamed when being Tased and stepped back into the cage. Exhibit 19; Exhibit 21, Renteria DPS interview at p. 4.

13.     LCDC jail guards are taught that a Taser is the last mechanism to use to control an inmate, to limit exposure to Tasers as much as possible, and to wait between applications to see if the subject will comply with orders. Exhibit 2 at p. 10. Exhibit 20, Rule 30(B)(6) at pp. 96-97. Defendant Elford did not give Plaintiff a chance to comply, contrary to LCDC training and policy. Defendant Elford's Taser certification had expired before March 3, 2011, and according to jail policy Defendant Elford was not supposed to be armed with or use a Taser. Exhibit 7 at pp. 78-79; Exhibit 20 at 86-87.

14.     Defendant Elford Tased the Plaintiff because the Plaintiff had "already assault[ed] an officer (Chavez) while he was in the cage." Exhibit 7 at pp. 74-75. When Plaintiff was Tased, Defendant Chavez was out of harm's way. Defendants' Exhibit C. Elford has drawn his Taser several times on inmates, and has said things like "Look how I got that guy" when guards watched videos of inmates being tased or maced. Exhibit 16 at pp. 35-36. While the Plaintiff was being Tased, he was also pepper sprayed by Defendant Chavez. Exhibit 17 at p. 6. LCDC guards were trained that pepper spray inhibits breathing. Exhibit 8 at p. 57. Defendant Elford was trained to restrain people immediately after deploying a Taser but failed to restrain the Plaintiff after he was Tased the first two times. Exhibit 7 at p. 36; Defendants' Exhibit C at 14:30-14:48.

15.     After being Tased three times, the Plaintiff ran out of the booking cage "through"

or "past" the detention officers toward the holding cell in the corner of the booking area.

Defendants' Exhibit C at 14:57 - 15:02; Exhibit 7 at p. 79; Exhibit 21 at p. 4; Exhibit 16 at p. 22-

24.   The Plaintiff did not try to strike or fight with any of the detention officers when running out

of and away from the booking cage.  Defendants' Exhibit C at 14:57-15:02; Exhibit 7 at p. 79.

The Plaintiff 'bolted' past the fingerprint machine and ran through the guards; Chavez put arms

around Plaintiff's head and shoulder and tried to take him down but couldn't.  Exhibit 16 at pp.

23-25.[3]  Elford then put his arms around the Plaintiff's head and shoulders and slammed Plaintiff

to the ground.  *Id*.  Defendants Elford and Chavez and detention officers Renteria and Gallegos

and others tackled the Plaintiff to the ground in the corner of the booking area by the holding

cell, outside the view of the surveillance camera, and wound up in a "dog pile" on top of the

Plaintiff.  Exhibit 22, Quintana report; Exhibit 10 at pp. 6-7; Exhibit 14 at p. 61 (all her guards

were on the floor).  Defendants Elford and Chavez and three other guards collectively tried to

restrain Plaintiff and fell "with him next to the holding cell".  Exhibit 7 at p. 79; Defendants'

Exhibit C at 14:57-15:02.  The two biggest guards at LCDC were holding the Plaintiff down.

Exhibit 11 at pp. 13-14.  "Collectively just with the overall weight of maybe 6 to 7 officers, we

all just fell by the holding cell in the corner".  Exhibit 23, Elford DPS interview at 10.

16.     When the Plaintiff was thrown to the ground he landed on his back.  Exhibit 16 at

p. 25.  Inmate Barshaw, who was watching the entire incident through the food port in his cell,[4]

---

[3]A portion of Chavez' attempt to tackle the Plaintiff can be seen on Defendants' Exhibit
C between the 14:48 and 15:10 marks.

[4] Mr. Barshaw was in cell J104 which had a food port in the door that was open with
approximate dimensions of  6" by 18" through which he could see whole booking room including

heard Plaintiff make a wheezing sound like he had the wind knocked out of him. *Id.* at 25. The guards turned Plaintiff over on his stomach, and a 'rookie' guard, Javier Gallegos, grabbed Plaintiff's legs and pushed them forward toward Plaintiff's back. *Id.* 26; Exhibit 12 at pp. 6-7, 77; Exhibit 24, Tindall Affidavit; Exhibit 16 at p. 26. Defendant Chavez was holding Plaintiff's torso down, putting weight on Plaintiff with his hands. Exhibit 16 at pp. 27, 38; Exhibit 2 at p. 30; Exhibit 16 at p. 27. Officer Loya was holding Defendant's Chavez' back to help him get leverage on the Plaintiff to keep Plaintiff down on the floor. Exhibit 9 at p. 9. Defendant Elford had his knee jammed in Plaintiff's neck. Exhibit 15 at p. 28.

17.     In the corner, the Plaintiff was screaming while on the ground until handcuffs were put on and then Plaintiff became unresponsive. Exhibit 9 at p.12. By the time Officer Loya walked behind the booking counter (Defendants' Exhibit C at 17:52), Plaintiff's hands were behind his back. Exhibit 25, Loya deposition at 69. The guards put leg shackles on the Plaintiff at approximately the same time he was cuffed. Exhibit 7 at p. 30. When the Plaintiff had been handcuffed, he was wiggling a little but was not thrashing around, and was just laying there breathing, not saying anything. Exhibit 15 at p. 23. After about a minute after the Plaintiff was cuffed he went silent and 'just laid there'. Exhibit 2 at pp. 42-43.

18.     LCDC guards were taught to avoid hog tying and placing pressure on the back and diaphragm once they have restrained someone and not to hog tie someone after they had been pepper sprayed. Exhibit 20 at pp. 45-46. In LCDC's use of force training, guards were taught not to apply pressure on the lower backs or stomachs of people being restrained. *Id.* at p. 52, and were trained to avoid hog tying inmates. *Id.* 52, 53 and 54. Guards were also taught to sit

————————————————

the corner by the holding cell where the Plaintiff had been tackled. Exhibit 16 at pp. 6-8, 15.

subjects up or put them on their left side in a recovery position as soon as "feasibly possible"after they had been restrained and no longer posed risk of harm to self or others. *Id.* 49-51, 56.

19.     According to Defendant Elford, it took two minutes to handcuff the Plaintiff behind his back after he was thrown to the floor and Plaintiff's legs were shackled at approximately the same time.  Elford DPS 13, 14.  The Plaintiff was thrown to the floor at the 15:02 mark of the surveillance video.  Defendants' Exhibit C.  The Plaintiff was dead quiet, and inmate Barshaw did not hear wheezing sounds any longer or see the Plaintiff thrashing around within about 3 minutes of Plaintiff being thrown to the ground.  Exhibit 16 at p. 29.  After being thrown to the ground, the Plaintiff did not try to get away.  *Id.* at 30.  Plaintiff was cuffed, he had no more energy, did not move, and just laid there on his stomach and became unresponsive quickly.  Exhibit 13 at pp. 10-11; Exhibit 9 at p. 12.  After this time (approximately the 18:09 mark on Defendants' Exhibit C) when Defendant Edwards returned with leg shackles, the Plaintiff did not pose a risk of harm to himself or others.  After being cuffed, the Plaintiff was not speaking but was constantly making loud noises which Defendant Edwards described as "uh-aah-uh".  Exhibit 14 at 62-63.

20.     After this point, the Plaintiff was laying chest down in the corner near the holding cell, one guard had a hold of his legs and was pushing them forward toward his back "like a restraint" while another guard had his knee on Plaintiff's back.  Exhibit 24, Tindall affidavit; Exhibit 16 at p. 26.  Plaintiff was not moving at all during the entire time.  Exhibit 24.

21.     Contrary to LDC training and policy, Defendants Elford and Chavez continued to restrain the Plaintiff in a prone position placing weight on his back and neck.  Exhibit 24; Exhibit 16 at p. 26.  The Plaintiff was held in the prone position the entire time he was restrained.

Exhibit 7 at p. 82; Exhibit 24.

22.     Defendants Elford, Chavez and McGrael made no effort to sit the Plaintiff up or turn him on his side, and when officer Renteria briefly turned Plaintiff on his side, Defendant McGrael told him to lay Plaintiff back down in the prone position. Exhibit 7 at p. 107; Defendants' Exhibit C, 15:02-34:56; Exhibit 10 at p. 11.  When Officer Renteria turned Plaintiff onto his side he looked at his eyes and they were rolled back.  Exhibit 21 at p. 14.  Plaintiff soiled his underwear as a result of being restrained.  Exhibit 9 at pp. 10-11.  Defendants Elford and Chavez were trained that positional asphyxia posed a risk of serious injury and death, and to sit a subject up as soon as feasibly safe to do so in order to reduce risk of serious injury or death from positional asphyxia.  Exhibit 20 at pp. 102, 56.

23.     Defendant McGrael, was responsible for maintaining a healthful and secure environment for occupants of LCDC.  Exhibit 26.  The only medical attention McGrael provided to the Plaintiff was to take his pulse, measure his respiratory rate, and administer smelling salts which caused the Plaintiffs eyes to flutter.[5]  Exhibit 27[6]; McGrael depo 69; Exhibit 11 at 9-11. No CPR was performed on Plaintiff.  Exhibit 12 at p. 85.  For more than four minutes after

_____

[5]The administration of smelling salts occurs at the 21:56 mark of the surveillance video, almost four minutes after the Plaintiff had become unresponsive.

[6]Defendant McGrael's testimony that he took Plaintiff's pulse and administered smelling salts is contained in LCDC Sgt. Gilmore's written report of his internal investigation performed immediately after the March 3, 2011 incident.  Defendant Luna County's risk manager confiscated the computer on which the recorded statements of witnesses taken by Sgt. Gilmore were located and had the hard drive removed.  Although the Defendants were able to locate that hard drive after it had been removed for their own purposes, Defendants claimed they could not find it and produce it to the Plaintiff in this litigation.  Plaintiff does not have the recorded statement provided by Defendant McGrael, or those provided by several other eye witnesses, because Defendant Luna County failed to preserve that evidence.

Defendant McGrael got up from the corner (15:40), Defendant McGrael slowly walked around the booking area (16:11), picked up something off the booking counter and placed it in his holster (16:19), held his shoulder and looked at the guards on the floor restraining the Plaintiff (19:04), looked in the window of a cell adjacent to the booking area (19:31), left the booking area and returned, and placed a canister on the booking counter (21:25). Defendants' Exhibit C at 15:40, 16:11, 16:19, 19:04, 19:20, 19:31, 19:46, 21:25. When Defendants Elford, Chavez and McGrael were asked whether they were going to administer CPR to the Plaintiff by another inmate in a cell adjacent to the booking area, the inmate was told to "shut the fuck up" and a guard closed the door to his food port so he could no longer watch what was happening. Exhibit 16 at p. 32; Defendants' Exhibit C at 22:20. Defendant Elford got up from the corner at approximately the same time. *Id.* The Plaintiff was silent until an ambulance arrived. *Id.* at p. 33.

24.     Defendant McGrael said he had decided that the Plaintiff needed medical assistance before he administered smelling salts to the Plaintiff at the 21:56 mark of the surveillance video. Exhibit 27. Defendant McGrael referred to the Plaintiff as a "fucking meth head" when EMTs arrived. Exhibit 16 at p. 34. Defendant McGrael, LCDC's medical officer, who broke his collar bone after Defendant Elford pushed him into a cell door handle in the rush to tackle the Plaintiff, Exhibit 11 at p. 12; Exhibit 8 at p. 62, blamed the Plaintiff for his injury. Exhibit 16 at p. 34.

25.     Defendant Edwards' duties as a Seargent were to supervise the guards on her squad; she was Defendant McGrael's direct supervisor, and she was the highest ranking official on duty and the officer in charge on March 3, 2011. Exhibit 14 at pp. 15, 23, 48-49. While the

Plaintiff was being restrained in a prone position, Defendant Edwards, gave no instructions or orders to her subordinates regarding: whether to Tase or pepper spray the Plaintiff, whether to restrain the Plaintiff, whether to keep Plaintiff in the prone position, whether to place the Plaintiff on his side or sit him up (even though she had been trained in positional asphyxia) and to put people who were being restrained in the prone position on their side. *Id.* at pp. 85-87, 92-93. Someone other than Defendant Edwards made the decision to place the Plaintiff in leg shackles. *Id.* at p. 86. Defendant Edwards did not call for emergency medical personnel for at least seven minutes after the Plaintiff had become unresponsive and exhibited obvious signs of being unable to breathe.[7] Defendant Edwards placed three or four phone calls before calling for EMTS. Defendants' Exhibit C at 23:14; 24:01; 24:24; and 25:49.

26.     LCDC's mission was to establish a safe and secure environment for detained persons 76. Exhibit 28. Defendant Luna County was responsible for ensuring a reasonably safe environment was provided to occupants, for protecting occupants from use of excessive force by guards, for adequately supervising guards, for providing occupants with reasonable and necessary medical care, for ensuring guards were properly trained so they acted in accordance with jail policies and for ensuring guards did not injure occupants. Exhibit 29, Krehbiel deposition at pp. 78-80.

27.     The only thing Defendant Edwards remembered about training on positional

---

[7]The EMTs report, Dkt 152-4, page 2, shows EMTs arrived in the booking area at 23:52 and that they were notified by dispatch of the need to come to LCDC at 23:44, eight minutes before they arrived. The EMTs arrived in the booking area at the 34:56 mark of the surveillance video. The EMTs therefore had to have been called at approximately the 26:56 mark of the surveillance video. That video shows Defendant Edwards placing two calls in that time frame; one at 25:49 and one at 27:22. Thus, Defendant Edwards did not call for EMTs for at least seven minutes after the Plaintiff had become unresponsive.

asphyxia was to put people on their sides, and she could not recall any thing else she was taught about positional asphyxia. Exhibit 14 at pp. 92-94. Officer Gallegos did not recall what he was taught about positional asphyxia, restraint positions, the risks of suffocating inmates if restrained in certain positions, or hog tie restraints. Exhibit 12 at p. 13. Defendant McGrael did not recall receiving any training on positional asphyxia or the potential risks associated with prone position restraints, but does recall he was trained to put people in the prone position to restrain them. Exhibit 8 at pp. 16, 21-22. Defendant Elford did not know what positional asphyxia is, but was trained to restrain people in the prone position, but did not recall any training relating to whether people restrained in the prone position should be kept in the prone position. Exhibit 7 at pp. 86-87. LCDC's warden, Defendant Krehbiel never received any training in positional asphyxia, and did not even know what positional asphyxia was until day before his deposition was taken on December 14, 2012. Exhibit 29 at pp. 97- 98.

28.    The OC (pepper spray) training materials used to train guards on positional asphyxia consisted of a "short slide" at the end of a powerpoint presentation which was prepared by the manufacturer of the OC spray.[8] Exhibit 20 at p. 47. The only training on positional asphyxia that was given to guards was not to place pressure on a subjects back or stomach and to place subjects on their left side or sit them up as soon as feasibly possible. *Id.* at pp. 50, 52. Guards were not taught that it is possible to cause positional asphyxia to someone when they are left in a prone position too long, or that there were additional risks of positional asphyxia to

---

[8]Defendants were notable to produce this slide to the Plaintiff because the training materials it was contained in were taken by the County's Risk Manager and could not be found. None of the training materials produced by the County contained any information about or references to positional asphyxia.

subjects who had been Tased or pepper sprayed.  *Id.* at 53.

29.     During the time Krehbiel was the warden, no LCDC employees were disciplined for improperly restraining occupants, using improper or excessive force, using improper control techniques, or providing inadequate medical care.  *Id.* 14-15.

30.     Defendant McGrael, as the medical officer was responsible for dealing with all medical incidents inside LCDC.  Exhibit 8 at pp. 9-10.   His basic training consisted solely of watching 40 hours of video tapes.  *Id.* at p.11.   Those videos were obtained by the County is 2002 and were produced by private company, Lockup USA.  Exhibit 20 at p. 34.  As of December, 2012, those videos had never been updated since they were purchased.  *Id.*   Those training tapes do not include any information about positional asphyxia.  *Id.* at p. 54.  Defendant McGrael did not receive any training on positional asphyxia or the risks associated with restraining people in the prone position.   Exhibit 8 at pp. 16, 21-22.  In fact, Defendant McGrael was trained to restrain people in the prone position.  *Id.* at 21-22.

## STANDARD OF REVIEW

Summary judgment is not appropriate where there is a genuine issue as to any material fact.  Fed. R. Civ. P 56(c).  In reviewing motions for summary judgment, this court may not weigh the evidence or make credibility determinations.  *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Res.,* 527 F.3d 1045, 1050 (10th Cir. 2008).  The evidence, and all reasonable inferences therefrom, must be viewed in the light most favorable to the nonmoving party.  *Id.*  "A disputed fact is 'material' if it might affect the outcome of the suit under governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the moving party" *Allen v. Muskogee, Okla.,*  119 F.3d 837, 839 (10th Cir.1007) citing *Anderson v.*

*Liberty Lobby,* 477 U.S. 242, 248 (1986).

**1. Summary Judgment Should Not Be Granted on Plaintiff's Negligence Claims under the Tort Claims Act**

Plaintiff claims in Counts I and V the Defendants are liable for their negligent acts under sections 41-4-6 and 41-4-12 of the Tort Claims Act (TCA). Section 41-4-6 waives immunity for the negligent operation of public buildings, §41-4-6 NMSA 1978, while §41-4-12 waives immunity for negligent acts and omissions of law enforcement officers which cause one of the torts enumerated therein. *McDermitt v. CCA,* 112 N.M. 247, 248, 814 P.2d 115 (Ct. App. 1991); §41-4-12 NMSA 1978. Plaintiff contends the Defendants' negligent acts and omissions resulted in battery and the violation of Plaintiff's constitutional rights in violation of subsection 12.

**A. Negligent Operation of a Public Building**

The Defendants can be held liable under §41-4- if they negligently operated LCDC in a way that created a dangerous condition. *Leithead v. City of Santa Fe,* 1997 NMCA 41 at *5, 123 N.M. 353. Liability under subsection 6 is not limited to injuries caused by physical defects in a public facility, but instead is premised on the negligent creation of a dangerous condition in the operation of a public building. *Id.* at *12. While a claim under this subsection cannot be premised solely on negligent supervision, *Upton v. Clovis Municipal School Dist.,* 2006 NMSC 40 at *16, 140 N.M. 205, a defendant's general failure to implement safety policies, including the failure to supervise public employees and persons using a public building, which causes an injury will support a claim under subsection 6 of the TCA. *Id.* at *18. The critical question is whether the defendants' negligence creates a potential risk to the class of persons who use the building in question. *Id.* at *22-23.

Section 41-4-6 imposes a duty on the Defendants to exercise reasonable care to prevent or correct dangerous conditions on public property. *Williams v. Central Consolidated School Dist.,* 1998 NMCA 6 at *10, 124 N.M. 488. This duty includes the duty to act reasonably and take reasonable precautions to protect users of public buildings from foreseeable dangers. *Id. citing Seal v. Carlsbad Indep. Sch. Dist.,* 116 N.M. 101, 104, 860 P,2d 743 (1993). Public employees have a duty to exercise ordinary care in the operation of a public building, *Cobos v. Dona Ana County Housing Auth.,* 1998 NMSC 49 at **1,7, 126 N.M. 418. It is the duty of LCDC to provide for the safekeeping of every person committed to LCDC, §33-3-3 NMSA 1998, and "establish a safe, secure and humane facility" for users of that facility. "When one party is in the custodial care of another, as in the case of a jailed prisoner, the custodian has a duty to exercise reasonable and ordinary care for the protection of the life and health of the person in custody." *City of Belen v. Harrell,* 93 N.M. 601, 603, 603 P.2d 711, 713 (1979).

The above-recited facts establish the Defendants failed to implement a number of policies, and that this failure caused the Plaintiff to be injured. The Defendants failed to implement the following policies:

1. Placing intoxicated persons in a holding cell until they sobered up before completing the booking process;

2. De-escalating situations involving non-compliant inmates before resorting to force;

3. Having jail guards call for the assistance of a supervisor before having other detention officers help physically restrain the Plaintiff; and

4. Allowing guards whose Taser certification has expired to carry and use Tasers on occupants of LCDC.

Most importantly, the Defendants failed to implement their policies regarding the restraint of a person in their custody. The Defendants restrained the Plaintiff in a prone, hog tied position for a prolonged period after he had been pepper sprayed; they placed weight on his back, stomach, and neck; they failed to turn the Plaintiff on his side or to sit him up once he was restrained, and they continued to apply pressure on the Plaintiff's back and neck afer he had become unresponsive and no longer posed a threat. It was Defendant Luna County's policy, as expressed through its training of jail employees, not to restrain users of LCDC in a hog tie position, and to turn a restrained person on their side or sit them up as soon as possible in order to avoid a risk of serious injury or death from positional asphyxia. Exhibit 20 at pp. 53-56.

The risk of serious injury or death from positional asphyxia and hog tie restraint is not, as Defendants argue, "unique to a particular inmate". Instead, that risk applies to everyone who uses the LCDC facility. Moreover, the Defendants' multiple failures to implement safety policies is not a "single, discrete administrative decision affecting only a single person" like that at issue in *Archibeque v. Moya,* 116 N.M. 616, 621, 866 P.2d 344, 349 (1993). The acts and omissions of the Defendants in failing to implement their safety policies regarding hog tying and prone restraints created a dangerous condition and potential risk to the class of persons who use the building in question. *Upton* at *22-23.

The above-recited facts also create an issue of material fact whether Defendants negligently supervised the public employees responsible for caring for the Plaintiff and whether that negligent supervision created a dangerous condition for the occupants of LCDC. At no time did the officer in charge, Defendant Edwards, exercise any supervisory authority over Defendants Elford, Chavez or McGrael, tell them not to hog tie the Plaintiff, not to keep him in a prone

position, or turn the Plaintiff on his side or sit him up, even though she was trained to place people who had been restrained in a prone position in a sitting position in order to avoid positional asphyxia. Defendant Edwards failed to do this even though LCDC employees were trained not to hog tie jail occupants and that positional asphyxia posed a risk of serious injury or death. Thus, the above stated facts establish an issue of material fact whether the defendants negligently failed to implement a number of safety policies and practices, and failed to supervise its employees, thereby creating a dangerous condition in the operation of LCDC which created a potential risk to the class of persons using LCDC. Summary judgment on Plaintiff's claims under §41-4-6 NMSA 1978 is therefore unwarranted due to the existence of genuine issues of material fact.

### B. Negligence of Law Enforcement Officials

The same is true of Plaintiff's claims under §41-4-12 NMSA 1978 which contend the actions of the Defendants resulted in the Plaintiff's battery and the violation of his constitutional rights. Both battery and the violation of constitutional rights are torts enumerated in §41-4-12 NMSA 1978 and can therefore form the basis of a finding of liability under that section of the TCA. *McDermitt*. Under the Tort Claims Act, the tort of civil battery can be established by evidence that a reasonable person standing in the Defendants' shoes would realize that harm was a substantially certain outcome of their actions. *California First Bank v. State of N.M.,* 111 N.M. 64, 74, 801 P.2d 646 (1990).[9]

---

[9]Defendants' reliance on *Jonas v. Bd. of County Com'rs. of Luna County,* 699 F.Supp.2d 1284 (D.N.M. 2010) is misplaced. First, *Jonas* involved an alleged battery by police officers in the context of an arrest which implicated the Fourth Amendment. This case involves a battery against a pre-trial detainee by jail guards which does not implicate the Fourth Amendment. See, *Porro v Barnes,* 624 F.3d 1322 (10th Cir. 2010)(Fourteenth Amendment, not the Fourth

The individual defendants, all of whom were county jailers, are law enforcement officers within the meaning of section 12 of the TCA and thus subject to liability under that section. *Davis v. Bd. of County Comm'rs. of Dona Ana County*, 127 N.M. 785, 796, 987 P.2d 1172, 1183 (Ct. App. 1999). The Defendants owed a duty to exercise reasonable and ordinary care for the protection of the life and health of the Plaintiff, *City of Belen,* and to provide for the safekeeping of every person committed to LCDC, §33-3-3 NMSA 1998. A corrections officer's negligent failure to protect persons in custody gives rise to a claim under the Tort Claims Act. *Methola v Eddy County,* 85 N.M. 329, 333, 622 P.2d 234 (1980).[10]

At a minimum, the above-stated facts, viewed in a light most favorable to the Plaintiff, create an issue of material fact whether as to the Defendants failed to exercise reasonable and ordinary care in the protection of the life and health of the Plaintiff and whether Defendants' battered the Plaintiff when they continued to hog tie and restrain the Plaintiff in a prone position, while placing pressure on his back and neck, and failing to turn him on his side or sit him up after he became unresponsive and no longer posed a threat to himself or others. The fact that the Defendants had been trained that hog tying and placing pressure on a restrained person's diaphram posed a risk of positional asphyxia, and that positional asphyxia posed a risk of serious

---

Amendment, applies to excessive force claims against pre-trial detainees*)*. Second, the *Jonas* court's analysis of the elements of civil battery relied on cases that were decided well before the New Mexico Supreme Court's decision in *California First Bank,* which expressly established that liability for civil battery does not require a showing of intent to cause harmful or offensive contact.

[10]The Defendants' argument that the Plaintiff has not "identified what duty was owed to the Plaintiff" is not well taken since paragraphs 54 and 55 of the Plaintiff's Second Amended Complaint specifically list several of the duties at issue in this case. Moreover, the warden of LCDC, Defendant Krehbiel, has admitted that LCDC owed the Plaintiff all of the duties listed in paragraph 54 of the Plaintiff's Second Amended Complaint.

injury and death, creates a genuine issue of material fact whether Defendants Elford and Chavez would have realized that serious injury to, or the death of the Plaintiff was a substantially certain outcome of their actions, and thus constituted a battery.

Moreover, these facts establish a genuine issue of material fact whether Defendants negligently trained and supervised jail employees involved in the Plaintiff's restraint and caused the Plaintiff to be battered. Claims of negligent supervision and training are actionable under section 41-4-12 of the Tort Claims Act if the negligent supervision causes one of the torts enumerated in that section. *Ortiz v. N.M. State Police,* 112 N.M. 249, 350, 814 P.2d 117 (Ct. App. 1991); *McDermitt* at 247. Here, the officer in charge utterly failed to supervise her subordinates regarding their restraint of the Plaintiff. Defendant Edwards failed to provide any supervision whatsoever, and in particular, failed to instruct her subordinates not to hog tie the Plaintiff, and not to place pressure on his back while he was restrained in the prone position. Furthermore, she failed to instruct them to sit the Plaintiff up once he no longer posed a risk of harm to himself or others. These same facts create a genuine issue of material fact whether the Defendants negligently failed to protect the life and health of the Plaintiff.[11] Summary judgment on Plaintiff's claims under the TCA contained in Counts I and V is therefore inappropriate.

### 2. Summary Judgment Should Not Be Granted on Plaintiff's Excessive Force Claims Under 42 U.S.C. §1983

In Count II, Plaintiff asserts a claim of excessive force in violation of 42 USC §1983 against Defendants Elford , Chavez and McGrael. Defendants assert they are entitled to Summary Judgment on that claim.

---

[11] As discussed below, these same facts create an issue of material fact whether Defendants violated the Plaintiff's constitutional rights.

The Plaintiff occupied a status of a pre-trial detainee when he was brought to the Luna County Detention Center after he had been arrested but had not been convicted of violating his probation. As such, his claims of excessive force are analyzed under the Fourteenth Amendment due process clause. *Porro v. Barnes,* 624 F.3d 1322, 1325 (10th Cir. 2010). "[W]hen the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment - we turn to the due process clauses of the Fifth and Fourteenth Amendment and their protection against arbitrary governmental action by federal and state authorities." [12] *Id.* This Court's analysis of the Plaintiff's excessive force claims must therefore focus on three factors:

> (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor.

*Porro* at 1325 citing *Roska v. Peterson,* 328 F.3d 1230, 1243 (10th Cir. 2003). "Force inspired by malice or unwise or excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment." *Id.* Force used against a detainee who does not pose a threat to law enforcement officials and which is disproportionate to the threat actually posed and unnecessary to restore discipline may support an excessive force claim under the Fourteenth Amendment. *Wernert v. Green,* 419 Fed. Appx. 337 (4th Cir. 2010).

Summary judgment on the Plaintiff's Fourteenth Amendment excessive force claim should not be granted because there are genuine issues of material facts with respect to whether the force used by Defendants Elford and Chavez was grossly disproportionate to the threat posed

---

[12]The Defendants' argument that the force used against the Plaintiff was objectively reasonable under a Fourth amendment analysis, and its reliance on *Hagans v. Franklin County Sheriff's Office,* 695 F.3d 505 (6th Cir. 2012) is therefore inapposite.

by the Plaintiff, whether that force was used in retaliation for Plaintiff's refusal to comply with the Defendants' orders, his previous assault of Defendant Chavez[13], and his resistance to the Defendants' efforts to subdue him. There are also disputed issues of fact whether the force used by the Defendants was necessary to restore order and discipline within LCDC. The facts of this case show that Defendants Elford and Chavez held the Plaintiff in a prone, hog tied position, and applied pressure to his back, stomach and neck for several minutes after the Plaintiff had become unresponsive and was not a threat to himself or others. *See, Weigel v. Broad,* 544 F.3d 1143 (10th Cir. 2008). This evidence also supports the conclusion that the force used by these Defendants was unnecessary to restore order or discipline in LCDC, was grossly disproportionate to the threat, if any, posed by the Plaintiff, and was therefore excessive.

The facts also support a reasonable inference that the Defendants' actions were taken in retaliation for the Plaintiff's non-compliance and flight away from the booking cage. Defendant Elford Tased the Plaintiff three times, not to restore order, but because the Plaintiff had previously assaulted Defendant Chavez. At the time Plaintiff was Tased, Defendant Chavez was well out of harm's way. Elford was known to gloat about his use of force against inmates. Defendant Chavez, unsuccessfully tried to tackle the Plaintiff and hurt his knee in the process. Defendant McGrael whose collar bone was broken in the rush to tackle the Plaintiff blamed the Plaintiff for his injury. These facts support a reasonable inference that these Defendants may have been acting with unwise or excessive zeal, and that their continued prone restraint of the Plaintiff was retaliatory in nature, and unnecessary to restore order. It is undisputed that the

---

[13]It is important to remember that the Plaintiff's alleged assault of Defendant Chavez consisted of his grabbing Chavez' shirt, and pulling Chavez into the booking cage with him, and that the Plaintiff never actually struck the detention officers involved in his restraint.

Defendants' use of force, after the Plaintiff became unresponsive and was no longer a threat, was unnecessary to restore order.

The evidence further supports the reasonable inference that the Plaintiff was positionally asphyxiated as a result of these actions on the part of Defendants Elford and Chavez and that he died as a proximate result thereof. The extent of the injury inflicted by these Defendants' use of force therefore cannot be overstated. The Defendants' continued hog tie, prone restraint of the Plaintiff after the Plaintiff had become unresponsive also supports the conclusion that the force used by Defendants Elford and Chavez which led to the Plaintiff's death by homicide was not only excessive, but amounted to an abuse of official power that shocks the conscience. *See, Weigel; Cruz v. City of Larame, Wyo.,* 239 F.3d 10th Cir. 2001).

Thus, this Court should deny Defendants' motion for summary judgment as to Count II.

**3.      Summary Judgment Should Not Be Granted on Plaintiff's Claim of Deliberate Indifference to Serious Medical Needs**

In Count III, Plaintiff claims a violation of the decedent's constitutional rights based on a failure to provide medical attention. "Under the Fourteenth Amendment due process clause, pretrial detainees are entitled to the same degree of protection against denial [or delay] of medical attention which applies to convicted inmates under the Eighth Amendment. *Martinez v. Beggs,* 563 1082, 1088 (10th Cir 2009)(citations omitted). A claim of this sort "will be successful if the plaintiff shows 'deliberate indifference to serious medical needs.'" *Id.* The test for deliberate indifference involves both an objective and a subjective component. *Id.* The objective component is met if the harm suffered by the detainee "rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment" *Mata v.*

*Saiz,* 427 F.3d 745, 752-53 (10th Cir. 2005). Death is, "without doubt" sufficiently serious to meet the objective component under the Fourteenth Amendment due process clause. *Martinez* at 1089. In addition, a medical need is sufficiently serious to meet the objective component if it is "one so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Colbert v. Bd. of County Com'rs. For Okla. County,* 414 Fed. Appx. 156, 160 (10th Cir. March 1, 2011)*.*

In order to satisfy the subjective component, a plaintiff must show "that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Martinez* citing *Callahan v. Poppell,* 471 F.3d 1155, 1159 (10th Cir. 2006). To satisfy the subjective component, a prison official must know of and disregard an excessive risk to the health and safety of a detainee, and "must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "[T]he symptoms displayed by the detainee are relevant to the subjective component of deliberate indifference." *Martinez* at 1089. The fact finder may conclude that a prison official knew of the substantial risk of harm by circumstantial evidence or 'from the very fact that the risk was obvious." *Farmer* at 842.

Summary judgment on the Plaintiff's claim of deliberate indifference to serious medical needs is inappropriate given the facts of this case. Clearly, the objective component of the deliberate indifference analysis is met in this case given the fact the Plaintiff died from positional asphyxia. Moreover, LCDC employees who were present at the scene had been trained that hog tie and prolonged prone restraints and the placement of weight on a prone person's stomach and back posed a risk of serious injury or death to the person being restrained. The Plaintiff became

26

silent and unresponsive about three minutes after he was tackled in the corner of the booking area (roughly the 18:02 mark on the surveillance video). At that time, the Plaintiff eyes were closed or rolled back in his head, and he was constantly making loud noises that sounded like "uh-aah-uh", and displaying obvious signs of being unable to breathe properly. A reasonable jury could conclude from these facts that the Plaintiff's need for medical care was so obvious even a lay person would recognize it. Indeed, an inmate in one of the cells adjacent to the booking area recognized the need for medical treatment when he asked the guards restraining the Plaintiff if they were going to administer CPR.

The facts also establish a genuine issue of material fact whether the subjective component of the deliberate indifference analysis is satisfied. Defendants Elford and Chavez, had been trained that hog tie and prone restraints posed a risk of serous injury or death. Defendant McGrael was present at the scene and witnessed the Plaintiff's symptoms which demonstrated an obvious inability to breathe and serious medical distress. McGrael's internal affairs interview shows that he determined that the Plaintiff needed medical care *before* he administered smelling salts to the Plaintiff which occurred at the 21:56 mark of the surveillance video. Although McGrael claims he told his supervisor Defendants Edwards to call EMTs before he administered the smelling salts, the EMT reports shows that it took EMTs eight minutes from the point they were notified of the call to arrive in the booking area. The video shows that Defendant Edwards placed telephone calls at the 25:49 and 27:22 mark which means that Defendant McGrael did not request medical attention for the obviously distressed and unresponsive Plaintiff for several minutes after it became obvious the Plaintiff required medical attention.[14]

_____

[14] See footnote 7 on page 14.

"A prison medical professional who serves 'solely . . . as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if he or she 'delays or refuses to fulfill that gatekeeper role'" *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005) quoting *Sealock v. State of Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000). Deliberate indifference is manifested when prison personnel deny or delay access to needed medical care. *Estelle v. Gamble,* 49 U.S. 97, 104 -105 (1976). The surveillance video shows that after the Plaintiff had become unresponsive, Defendant McGrael did not administer any medical care or call for medical assistance for quite some time. Instead, he stood by, grabbed his shoulder, looked in the window of a nearby cell, left the booking area, returned and put a canister on the booking counter before he attended to the Plaintiff, and then did not request medical assistance for four more minutes. The fact that Defendant McGrael referred to the Plaintiff as a "fucking meth head" when EMTs arrived, and that he blamed the Plaintiff for breaking his collarbone supports a reasonable inference that Defendant McGrael's delay was deliberate. There is therefore an issue of genuine material fact as to whether Defendant McGrael acted with deliberate indifference in delaying the provision of needed medical care to the Plaintiff which precludes the grant of summary judgment on Plaintiff's claim of deliberate indifference to serious medical needs under §1983 which is contained in Count III.

4.      **Summary Judgment Should Not Be Granted on Plaintiff's
        Substantive Due Process Claim**

The Defendants' motion seeks summary judgment on Count IV which is the Plaintiff's substantive due process claim. Defendants argue that a substantive due process claim is not available when a plaintiff has recourse to an explicit textual source of constitutional protection.

*See*, *Graham v. Conor,* 490 U.S. 386, 395 (1989).  Defendants' argue that the Plaintiff's claims

in Counts II and III of his Second Amended Complaint are "the more explicit textual source in

this instance" is therefore misplaced.    The Defendants' argument is not well taken because all of

the Plaintiff's constitutional claims are based on the Fourteenth Amendment due process clause.

No other constitutional provision applies to this claim.  The Plaintiff therefore does not have

recourse to a separate explicit textual source of constitutional protection that precludes him from

bringing a substantive due process claim and Defendants; argument is misplaced.

      The Defendants further argue that summary judgment should be granted on Plaintiff's

substantive due process claim because there are no disputed issues of material fact regarding

whether the Defendants' alleged conduct "shocks the conscience".  The facts of this case as set

forth above provide a sufficient basis upon which a jury could find that the Defendants' actions

and omissions which led to the death by homicide of the Plaintiff constitute deliberate

indifference which "shocks the conscience", and therefore, at a minimum, create a genuine issue

of fact as to whether the Defendants' conduct shocks the conscience.

      In order to state a clam for the violation of the plaintiff's substantive due process claims

under the facts of this case, the plaintiff must show that the Defendants' actions amounted to

deliberate indifference to the Plaintiff which shocks the conscious of the court.  *Green v. Post,*

574 F.3d 1294, 130 (10th Cir. 2009).  Where the defendants have sufficient time to 'actually

deliberate' their actions, a plaintiff need not show an intent to harm in order to establish a

substantive due process violation.  *Id.*  In this case, the facts show that the Defendants continued

to restrain the plaintiff in a prone position while placing weight and pressure on his back and

neck for several minutes after he had become unresponsive and no longer posed a threat.  The

facts also show that the defendants delayed their call for medical care for several minutes after the need for that care became obvious. The defendants therefore had more than "a few minutes to think" thus triggering the deliberate indifference standard. *Id.* citing *Perez v. Unified Govt. Of Wyandotte Country,* 432 F.3d 1163, 1167 (10th Cir. 2005).

Defendant Elford Tased the Plaintiff three times in rapid succession, not to restore order or discipline, but because the Plaintiff had earlier assaulted Defendant Chavez by grabbing his shirt and pulling him into the booking cage. The Defendants then hog tied the obviously intoxicated and mentally disturbed Plaintiff, restrained him in a prone position for a prolonged period of time, and placed weight and pressure on the Plaintiff's neck, back and stomach. The Defendants continued to restrain the Plaintiff in this manner even after he became unresponsive and was no longer a threat. The Defendants restrained the Plaintiff in this manner even though they had been trained not to use this type of restraint, and failed to take any action to prevent or abate the risk of harm to the Plaintiff by sitting him up or placing him on his side. Indeed, the medical officer told officer Renteria not to place the plaintiff on his side. The Plaintiff died as a result of a homicide committed by the Defendants after he had turned himself in to authorities for violating the terms of his probation and less than 45 minutes after arriving at LCDC. Based on these facts, a reasonable jury could find that the Defendants' conduct demonstrated deliberate indifference to the Plaintiff which "shocks the conscience". There is therefore a disputed issue of material fact precluding a grant of summary judgment as to Count IV.

**5.    Summary Judgment Should Not Be Granted on Plaintiff's Claim of Supervisory Liability**

   **A.    Supervisory Liability Based on Failure to Supervise Against Defendant Edwards**

The Plaintiff has asserted two claims for supervisory liability. The first is a claim of direct supervisory liability against Defendant Edwards in Count VI based on her failure to supervise Defendants Elford, Chavez and McGrael when they were restraining the Plaintiff.

> To establish a violation of §1983 by a supervisor, . . . 'the plaintiff must establish a deliberate, intentional act' on the part of the defendant 'to violate [the plaintiff's legal rights. In the due process context, this means the focus is on the force the *supervisor* caused to be used, the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable.

*Porro* at 1327-1328 (citations omitted, emphasis in original). The *mens rea* required to establish supervisory liability is the state of mind required of the individual defendants who caused the alleged constitutional deprivations which, in this case, is deliberate indifference. *Id.* at 1328.

To establish direct supervisory liability against a supervisory employee, the plaintiff must establish that the supervisor was personally involved in the violation of the plaintiff's constitutional rights, there is a sufficient causal connection between the supervisor's involvement and the violation, and that the supervisor acted with a culpable state of mind. *Dodds v. Richardson,* 614 F.3d 1185, 1195 (10th Cir. 2010).[15] The personal participation of a supervisor can be established by proof of the supervisor's personal participation and "failure to supervise". *Id.*

The facts of this case show that Defendant Sgt. Edwards was the officer in charge on the night the Plaintiff was injured. She was responsible for supervising all of the guards involved in the Plaintiff's restraint including Defendants' Elford, Chavez and McGrael, and for ensuring they

---

[15] Supervisory liability claims against individual defendants under §1983 based on their personal failure to supervise which causes a constitutional deprivation clearly survive the United States Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). See e.g., *Dodds v. Richardson.*

acted in accordance with jail policies.   She was present in the booking area when the Plaintiff was being restrained in a hog tied, prone position even after he became unresponsive and no longer posed a threat.  When she entered the booking area, she observed that all of "her"guards were on the floor with the Plaintiff who was laying on the floor making constant loud noises that sounded to her like "uh - aah-uh".

By Defendant Edwards' own admission, she did absolutely nothing to supervise her subordinates.  She did not give any orders to anyone, gave no instructions whether to Tase or pepper spray the Plaintiff, whether to restrain the Plaintiff or whether to keep Plaintiff restrained in the prone position.  Defendant Edwards did not give any instructions to place the Plaintiff on his side or sit him up even though she had been trained in positional asphyxia and had been trained to put people who were being restrained in the prone position on their side.  All these failures occurred despite the fact the Plaintiff was unresponsive and displaying obvious signs of being unable to breath properly.  She did nothing to correct or countermand Defendant McGrael's instruction to detention officer  Renteria to leave the Plaintiff in the prone position after the Plaintiff had become unresponsive.

These facts establish Defendant Edwards' personal participation in the events that led to Plaintiff's injuries and death.  These same facts also establish an "affirmative link" and a causal connection between Defendant Edwards' failure to supervise her subordinates and the violations of the Plaintiff's constitutional rights which are alleged to have been violated.

Furthermore, these facts create a genuine issue of material fact whether Defendant Edwards acted with deliberate indifference to the Plaintiff's constitutional rights to be free from excessive force, to have the protection of his life and safety, and to receive medical care for his

serious medical needs. A reasonable fact finder could conclude that Defendant Edwards knew that the Plaintiff was at risk of serious injury or death from the manner in which he was being restrained and that he was being restrained in a manner contrary to Luna County's policies, yet stood idly by and watched while the Plaintiff's condition deteriorated before her eyes. These facts therefore create a genuine issue of material fact whether Defendant Edwards failure to supervise amounted to deliberate indifference when she failed to intervene after Defendant McGrael instructed another detention officer to keep the Plaintiff in a prone position after he had become unresponsive and failed to immediately summon medical assistance. A reasonable jury could find that Defendant Edwards' silence and acquiescence in the continued prone restraint of the Plaintiff, after he no longer posed a threat to himself or others and was displaying obvious signs of physical distress, coupled with her knowledge that the actions of her subordinates posed a risk of serious injury or death to the Plaintiff, was conduct that was deliberately indifferent to the Plaintiff's rights and which shocks the conscience. There are therefore genuine issues of material fact whether Defendant Edwards can be held liable for her failure to supervise Defendants Elford, Chavez and McGrael.

**B.      Supervisory Liability Based on a Failure to Train Against Luna County and Warden Krehbeil**

The Plaintiff has also asserted a supervisory liability claim against Defendants Luna County and Warden Krehbiel in Count VI based on their failure to adequately train its jail employees. To establish liability under this theory, the Plaintiff must show that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of his [due process] rights, that the policy makers of the [county] can reasonably be said to have

been deliberately indifferent to the need for additional training." *Porro* at 1328 quoting *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996). A plaintiff must identify a specific deficiency that was obvious and closely related to his injury. These Defendants can be held liable under §1983 for failure to train if their failure to train constitutes deliberate indifference to the rights of the persons with whom the individual defendants come in contact with. *Canton v. Harris,* 489 U.S. 378, 388 (1989). Where a county's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of the inhabitants, the failure to train can be found to be a "policy or custom" of the County. *Id* at 389.

To state a claim of municipal liability for failure to train, the plaintiff must show:

1. The individual defendants used excessive force, were deliberately indifferent to the Plaintiff's serious medical needs, or violated other constitutional rights;

2. The force at issue was used, or the failure to provide adequate medical care occurred in a circumstance that is a usual and recurring situation with which the Defendants have to deal;

3. The inadequate training demonstrates deliberate indifference toward the persons the defendants routinely come in contact with; and

4. There is a direct causal link between the inadequate training and the constitutional deprivation.

*Allen v. Muskogee, Okla.,* 119 F.3d 837, 841 (10th Cir. 1997); see also *Thompson v. Salt Lake County,* 584 F.3d 1304 (10th Cir. 2009). Evidence of a single violation of constitutional rights, accompanied by a showing that the defendants failed to train its employees to handle recurring situations presenting an obvious potential for such violation is sufficient to establish municipal liability. *Id.* at 842.

As shown previously, there are issues of material fact as to whether the individual

Defendants used excessive force, were deliberately indifferent to Plaintiff's serious medical

needs, and whether their actions which led to the death of the Plaintiff violated Plaintiff's

substantive due process rights.  The first element of the test set forth in *Allen* has therefore been

satisfied.

The second element can be satisfied with evidence that it was common for the Defendants

to deal with intoxicated or mentally ill people and that the use of force arose in circumstances

that constitute a usual and recurring situation.  *Id.*  The facts show that it was a common, usual

and recurring situation for highly intoxicated and/or mentally ill people to enter the Luna County

Detention Center.  It was also a usual and recurring situation to have to use force to maintain

control of the detention facility.  The second element has therefore been satisfied in this case.

The deliberate indifference element can be met with evidence that: 1) the need to train

officers in the constitutional limitations on the use of force can be said to be so obvious that the

failure to do so could properly be characterized as deliberately indifferent; 2) by evidence the

Defendants had actual or constructive notice that its actions were substantially certain to result in

a constitutional violation and that they consciously chose to disregard the risk of harm, *Barney v.*

*Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998); or 3)  the "violation of a federal right is a

'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such

as where a municipality fails to train an employee in specific skills needed to handle recurring

situations, thus presenting an obvious potential for constitutional violations."  *Id.*  at 1308.  In

this case, the County was aware that prone restraints in which pressure or weight is placed on the

back and stomach of the restrained person, and hog tie restraints in particular, posed a risk of

serious injury and death to the Plaintiff.  In fact, the County provided specific training to Defendants Elford and Chavez regarding this risk during their 40 hour basic training, and taught them to take certain actions to avoid or abate that risk.

Defendant McGrael, as the medical officer, was responsible for dealing with all medical incidents inside LCDC.   His basic training consisted solely of watching 40 hours of video tapes. Those videos were obtained by the County is 2002 and were produced by a private company, Lockup USA.  As of December, 2012, those videos had never been updated since they were purchased.  Those training tapes do not include any information about positional apshyxia. Defendant McGrael did not receive any training on positional asphyxia or the risks associated with retraining people in the prone position.   In fact, Defendant McGrael was trained to restrain people in the prone position.

 These facts support the conclusion that the need to train jail employees, and in particular the jail employees responsible for responding to all medical incidents within the jail (medical officers), about the risks of serious injury and death associated with positional asphyxia, and what to do to avoid or abate those risks was obvious.  A reasonable jury could further conclude from these facts that the need to train medical officers in these subjects was so obvious that the failure to do so was deliberately indifferent to the constitutional rights of persons within the jail.

A reasonable jury could also conclude from these facts that the violation of the Plaintiff's federal rights to be free from the use of excessive force in the implementation of prone restraints, to receive adequate medical care for his serious medical needs caused by the use of prone restraints and the resulting positional asphyxia was a 'highly predictable' or 'plainly obvious' consequence of the County and Warden's failure to train jail medical officer McGrael and thus

that the failure to train medical officer McGrael posed an obvious potential for constitutional violations. There is therefore an issue of material fact on whether Defendants Luna County and Warden Krehbiel acted with deliberate indifference to the rights of the Plaintiff when they failed to train Defendant McGrael in specific skills needed to handle recurring situations at LCDC which presented an obvious potential for constitutional violations.

"[W]here a municipality's failure to train its employees in a relevant aspect evidences a 'deliberate indifference' to the rights of its inhabitants" the failure to train can be found to be the municipality's policy or custom. *Canton* at 389. A reasonable jury could therefore find that Defendants Luna County and Warden Krehbiel's failure to train Defendant McGrael amounted to a County policy or custom, and that this policy was the moving force behind, and caused, the constitutional violations complained of by the Plaintiff. For these reasons, summary judgment on the Plaintiff's supervisory liability claims contained in Count VI against Defendants Luna County and Warden Krehbiel should not be granted.

### 6.    The Individual Defendants Are Not Entitled to Qualified Immunity Because the Plaintiff's Constitutional Right to be Free From Excessive Force Was Clearly Established

The Defendants claim that the individual Defendants are entitled to qualified immunity because "there is no clearly established law which has held that using a taser repeatedly on a subject actively resisting arrest and refusing to be handcuffed amounted to excessive force." Dkt. 152 at p. 16. The Defendants' qualified immunity argument is therefore limited to the Plaintiff's excessive force claim set forth in Count II of the Plaintiff's Second Amended Complaint, and does not seek summary judgment on qualified immunity grounds as to the Plaintiff's claims of deliberate indifference to his serious medical needs against Defendant McGrael (Count III), his

substantive due process claim against Defendants Elford, Chavez and McGrael (Count IV), or his claims of supervisory liability against Defendants Edwards, Luna County and Krehbiel based on a failure to train and supervise (Count VI).

When a Defendant raises the defense of qualified immunity, a plaintiff must demonstrate the Defendant's actions violated a specific constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). The Plaintiff has previously articulated with specificity, the conduct of Defendants Elford, Chavez and McGrael that is alleged to have violated substantive due process rights, his right to be free from excessive force, and his right to adequate medical care. The Plaintiff has therefore met his burden under the first element of the qualified immunity analysis. See, *Green v. Post,* 574 F.3d 1294, 1300 (10th Cir. 2009).

The next determination that must be made is whether the Plaintiff's constitutional right was clearly established at the time it was alleged to have been violated. *Id.; Gonzales v. Duran,* 590 F.3d 855, 859 (10th Cir. 2009). A right is clearly established if there is "a Supreme Curt or Tenth Circuit decision on point or if the weight of authority from other courts shows that the right must be as Plaintiff maintains." *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir. 2002). However, the exact action in question need not have been previously held to be unlawful in order for the law to be clearly established. *Hope v.Pelzer,* 536 U.S. 730, 739 (2002). General statements of law may provide enough warning to governmental actors that their conduct is unconstitutional even if the specific conduct in question has not been previously held to be unlawful. *Id.* at 740. [T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances". *Fogarty v. Gallegos,* 523 F.3d 11467, 1155 (10th Cir. 2008).

The Defendants' motion asserts that the individual defendants are entitled to qualified immunity because the law was not clearly established that the repeated use of a taser on a person who is actively resisting arrest and refusing to be handcuffed amounts to excessive force. Defendants' argument misconstrues the nature of the Plaintiff's excessive force claim. In this case, it is true Defendant Elford, who was not supposed to be armed with a Taser according to LCDC policy, shot the Plaintiff with a Taser three times in rapid succession, did not wait between applications to give the Plaintiff a chance to comply with orders, and targeted the Plaintiff's chest contrary to both the training he received from Luna County and the recommendations of the Taser manufacturer. *See*, Exhibit 6. However, it is the physical restraint of the Plaintiff in a prone, hog tied position for several minutes after the Plaintiff no longer posed any threat, *after he had been Tased*, that forms the basis of the Plaintiff's excessive force claim.

The law regarding the use of such restraint techniques was well established on March 3, 2011, when the Plaintiff was restrained. In *Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183 (10th Cir. 2001), the Tenth Crcuit held that officers may not restrain persons whose diminished capacity is apparent in a prone, hog tie position. *Id.* at 1188. In *Cruz*, the Defendant officers wrestled the Plaintiff to the ground, handcuffed him in a face down position, then bound his legs to stop him from kicking and drew his feet up toward his back. *Id.* at 1186. Thus, as of 2001, it was clearly established that the use of this type of restraint on a person with diminished capacity violated the constitutional rights of such persons. In this case, the facts show that plaintiff was mentally diminished and that this was apparent to the officers involved in his restraint. There is evidence the Plaintiff did not understand Defendant Elford's orders to sit down or proceed to have his photograph taken, that he could not understand why he was in jail even though he had

39

just turned himself in for violating his probation, and that he kept asking why he was in jail even after being told.  Furthermore, Defendants McGrael and Edwards, and detention officer Quintana all knew that the Plaintiff was intoxicated on methamphetamine.

In *Weigel v. Broad,* 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit again discussed whether prone restraints constituted an unconstitutional use of excessive force.  In *Weigel,* the plaintiff exhibited strange behavior and signs of intoxication, and resisted efforts to subdue and handcuff him. *Id.* at 1148-49.  The defendant officers handcuffed the plaintiff in a face down position and applied pressure to the Plaintiff's upper body while he was restrained in that position, even after the plaintiff no longer posed any threat until "it was determined he was in cardiac arrest".  *Id.*  In *Weigel,* the officers, like Defendants Elford and Chavez,  had been trained in the risks of positional asphyxia, not to place weight on a prone person's back or stomach, and to place restrained individuals on their side so as to lessen the risks associated with prone restraints. *Id.* at 1150.  In *Weigel*, there was also evidence the officers maintained the plaintiff in this position for three minutes after he no longer posed a threat.

In *Weigel,* the Tenth Circuit expressly stated that its prior decision in *Cruz* "made clear that similar future conduct was prohibited."  *Id.* at 1154.  In discussing its prior decision in *Cruz,* the Tenth Circuit stated:

> Specifically, we stated 'officers may not apply th[e hog-tie] restraint technique when an individual's diminished capacity is apparent.'  To reach this conclusion we not only evaluated hog-tying cases and the risks of that technique, we also generally discussed the known dangers of 'sudden custody death syndrome.'  We made specific note of 'the relationship between improper restraints and positional asphyxiation.'  In particular, we highlighted the 'breathing problems created by pressure on the back and placement in a prone positon,. . . .  The breathing problems lead to asphyxiation.

*Id.* at 1154.

The Tenth Circuit then found that a reasonable officer would have known that the continued placement of pressure "on a vulnerable person's upper torso while he was laying on his stomach" presented "a substantial and unnecessary risk of death to the person". The Court held that that Tenth Circuit law was clear that putting pressure on the back of a person restrained in the prone position when that person did not pose a threat to himself or others, violated the restrained person's constitutional right to be free of excessive force. *Id.* at 1154-1155. In addition, the Tenth Circuit found that "cases from other circuits have stated that it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at 1155. Accordingly, the defendants in *Weigel* were not entitled to qualified immunity. *Id.*

This case presents nearly identical factual circumstances. The Plaintiff was restrained in a prone position, while the defendants put pressure on his back and neck. The evidence shows that the defendants continued to restrain the Plaintiff in this manner for several minutes after the Plaintiff became unresponsive and no longer posed a threat to himself or others. The law was therefore clearly established that the actions of the defendants constituted excessive force. The individual Defendants are therefore not entitled to qualified immunity on the Plaintiff's excessive force claim.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests this Court to deny the Defendants' motion for summary judgment and award such other and further relief as the Court deems just and proper.

41

Respectfully submitted,

SANDERS & WESTBROOK, PC

_/s/ Duff Westbrook_
Duff Westbrook
102 Granite Ave. NW
Albuquerque, NM 87102
(505) 243-2243
d.sanderswestbrook@qwestoffice.net

and

Nathan Gonzales
Gonzales Law Firm
925 North Hudson Street
Silver City, NM 88061
(575)388-8015
nathan@gonzaleslaw.us

_Counsel for Plaintiff_


## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of January, 2013, I filed the foregoing electronically through the CM/ECF system which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

_/s/ Duff Westbrook_
Duff Westbrook