IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**CHARLES C. KRETEK,** as
Personal Representative of
Christopher Aparicio, Deceased,

      **Plaintiff,**

vs.                                            No. CIV 11-0676 RB/GBW

**BOARD OF COMMISSIONERS
OF LUNA COUNTY, JOHN KREHBIEL,
JOSH ELFORD, JONATHAN CHAVEZ,
JOHN ROBERT MCGRAEL,** and
**YOLANDA EDWARDS,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment on Plaintiff's Second Amended Complaint (Doc. 152). The Court's jurisdiction arises under 28 U.S.C. §§ 1331 and 1367. Having reviewed the parties' submissions and the relevant law, and being otherwise fully advised, the Court denies the motion.

**I.**     **Background**

Christopher Aparicio sustained serious injuries during an altercation with detention officers while he was in the custody of the Luna County Detention Center (LCDC) in Deming, New Mexico, and died as a result. Plaintiff brings this action for monetary damages as personal representative of Mr. Aparicio pursuant to the New Mexico Wrongful Death Act, N.M. STAT. ANN. §§ 41-2-1 through 41-2-4, the New Mexico Tort Claims Act, N.M. STAT. ANN. §§ 41-2-1 through 41-2-4, and 42 U.S.C. § 1983. Defendants move for summary judgment and assert

qualified immunity. Plaintiff opposes the motion.

## II. Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In cases where the moving party will not bear the burden of persuasion at trial, it bears the initial responsibility of identifying an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If the movant meets this initial burden, the burden then shifts to the nonmovant to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (quoting FED. R. CIV. P. 56(e) (2007 version)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009).

## III. Statement of Facts

The Court must view the facts in the light most favorable to Plaintiff, the non-moving party. *See id.* Thus, all reasonable inferences are drawn and factual ambiguities are resolved in his favor.

On March 3, 2011, at about 8:00 p.m., Deming police were dispatched in response to a 911 hang up call. (Def. Ex. 1, Doc. 152-1). The police officers found Christopher Aparicio in a nervous and paranoid state. (*Id.*) Mr. Aparicio informed the police that people wanted to kill him

and he was on probation. (*Id.*) Mr. Aparicio gave the police the name of his probation officer and asked to sit in the police car. (*Id.*) On the way to the police department, Mr. Aparicio admitted he had used methamphetamine. (*Id.*) The police officers contacted Mr. Aparicio's probation officer, who informed them that the use of methamphetamine constituted a probation violation. (*Id.*) An arrest order was faxed to the police department. (Def. Ex. 2, Arrest Order, Doc. 152-2). The police officers arrested Mr. Aparicio for violating the conditions of his probation. (Doc. 152-1). Mr. Aparicio was cooperative and indicated that he understood why he was being arrested. (*Id.*) The police officers handcuffed Mr. Aparicio and transported him to Mimbres Memorial Hospital for a medical examination. (*Id.*)

At the hospital, Mr. Aparicio informed medical personnel that he had ingested methamphetamine earlier in the day. (Pl. Ex.1, Deposition of Hassan Adnan, M.D., Doc. 166-1). Dr. Hassan Adnan examined Mr. Aparicio and found normal respiration and no bruises or injuries. (*Id.*) The neurological examination was normal. (*Id.*) Mr. Aparicio was restless but not agitated. (*Id.*) His mood was normal with no suicidal or homicidal ideation. (*Id.*) Dr. Adnan medically cleared Mr. Aparicio for detention, and Mr. Aparicio was transported to LCDC. (*Id.*)

Mr. Aparicio arrived at LCDC at about 11:19 p.m. (Pl. Ex. 3, Doc. 166-3). Defendant John Robert McGrael, the medical officer on duty at LCDC, conducted the initial intake of Mr. Aparicio in the vestibule of the facility. (Pl. Ex. 11, Interview of McGrael, Doc. 166-8; Pl. Ex. 8, Deposition of McGrael, Doc. 166-6). Mr. Aparicio admitted to Defendant McGrael that he had been using methamphetamine. (*Id.*) Mr. Aparicio displayed a slight amount of paranoia, but he was compliant during the intake process. (*Id.*) Defendant McGrael informed Defendant Yolanda Edwards, the supervisor on duty, that Mr. Aparicio would need a single cell once the booking

process was completed due to methamphetamine intoxication.  (*Id.*)

Mr. Aparicio was placed in a booking cage that measured approximately three feet by three feet.  (Pl. Ex. 2, Deposition of Jessica Quintana, Doc. 166-2).  At this point, Mr. Aparicio became agitated and asked repeatedly why he was in jail.  (*Id.*)  Jessica Quintana, the booking officer, unsuccessfully tried to calm Mr. Aparicio.  (*Id.*)  Officer Quintana knew that Mr. Aparicio was high on methamphetamine.  (*Id.*)  When Officer Quintana informed Mr. Aparicio that she needed to take his photograph, Mr. Aparicio became more agitated and Officer Quintana called for back-up.  (*Id.*)

Several detention officers, including Defendants Josh Elford and Jonathan Chavez, arrived and surrounded the booking cage.  (*Id.*)  Defendant Elford told Mr. Aparicio several times that he needed to have his picture taken. (Pl. Ex. 7, Deposition of Josh Elford, Doc. 166-5; Pl. Ex. 16, Deposition of Austin Barshaw, Doc. 166-14).  Mr. Aparicio agreed, but then changed his mind and refused to cooperate.  (Elford Dep. at 51-53).  Defendant Elford started yelling at Mr. Aparicio.  (Barshaw Dep. at 18-20).  Mr. Aparicio agreed to have his photo taken and Defendant Elford opened the door to the booking cage.  (Elford Dep. at 54-55).

Mr. Aparicio started to "freak out" and shake his arms around as if he were scared.  (Pl. Ex. 9, Interview of Michael Loya, Doc. 166-7).  Defendant Elford grabbed Mr. Aparicio's wrist and put his other hand behind Mr. Aparicio's elbow.  (Elford Dep. at 57).  Mr. Aparicio became combative and Defendant Chavez tried to handcuff him.  (*Id.* at 58-60).  Mr. Aparicio grabbed Defendant Chavez and pinned him against the side of a cage.  (*Id.* at 66-67).  Defendant Elford pulled Defendant Chavez out of the cage and the detention officers unsuccessfully tried to close the door.  (*Id.* at 69).

Defendant Elford drew his Taser and told Mr. Aparicio he would use it if Mr. Aparicio did not sit down. (Elford Dep. at 70). Mr. Aparicio was in the doorway of the booking cage and started screaming and pointing at the detention officers. (*Id*. at 74). Defendant Chavez sprayed Mr. Aparicio with pepper spray. (Pl. Ex. 17, Chavez Interview, Doc. 166-15). Defendant Elford used his Taser for five seconds on Mr. Aparicio but it had no effect. (*Id*. at 75). Defendant Elford deployed the Taser a second time for five seconds and Mr. Aparicio ran out of the cage. (*Id*.) Defendant Elford shot Mr. Aparicio with the Taser a third time for less than five seconds as Mr. Aparicio ran across the booking area. (*Id*. at 76).

Defendant Chavez tried to stop Mr. Aparicio, but he was unable to "get him down." (Barshaw Dep. at 24). Defendant Elford caught up to Mr. Aparicio, grabbed him by the neck, and slammed him to the floor on his back. (*Id.*) Mr. Aparicio made a wheezing sound as the air was knocked out of him. (*Id*. at 25). At least seven detention officers rolled Mr. Aparicio onto his chest and held him down on the floor in a corner out of view of the video camera. (Def. Ex. C, Video at 15:00; Pl. Ex. 16, Diagram of LCDC, Doc. 166-14). Officer Quintana described the scene as a "dog pile" on Mr. Aparicio. (Pl. Ex. 22, Quintana Statement, Doc. 166-17). Mr. Aparicio was handcuffed behind his back within two minutes after he hit the floor. (Pl. Ex. 23, Elford Interview, Doc 166-17). Defendant Elford asked a female officer to retrieve restraints and, within a few minutes, Mr. Aparicio was put in leg restraints. (*Id*.)

Within three minutes of the take down, three of the detention officers moved back into view, leaving at least four officers off camera with Mr. Aparicio. (Video at 18:07). Austin Barshaw and Eric Tindall, who were confined in surrounding holding cells, recounted that Mr. Aparicio was lying chest down on the floor. (Pl. Ex. 24, Affidavit of Eric Tindall, Doc. 166-18).

5

Defendant Elford jammed his knee into Mr. Aparicio's neck. (Barshaw Dep. at 28). Another detention officer held Mr. Aparicio's feet and pushed his legs forward while two other detention officers held his arms down. (Tindall Aff.). Detention officers continued to restrain Mr. Aparicio in a prone position on his chest after he became unresponsive. (Barshaw Dep. at 32). Defendants Elford, Chavez and McGrael made no effort to sit Mr. Aparicio up or turn him on his side, and when Officer Matthew Renteria briefly turned Mr. Aparicio on his side, Defendant McGrael told him to turn Mr. Aparicio back to the prone position. (Elford Dep. at 107; Video 15:02-34:56; Quintana Dep. at 11). When Officer Renteria turned Mr. Aparicio onto his side, his eyes were rolled back. (Pl. Ex. 21, Renteria Dep. at 14, Doc. 166-7). Mr. Aparicio soiled his underwear during the incident. (Pl. Ex 9, Interview of Michael Loya at 10-11, Doc. 166-17).

Defendant Yolanda Edwards, the supervisor on duty, arrived on the scene as the detention officers tackled Mr. Aparicio and she remained in the booking area at all relevant times. (Pl. Ex. 14, Edwards Dep. at 57-60, Doc. 166-17; Video).

During the melee, Defendant McGrael sustained a broken collar bone when Defendant Elford pushed Defendant McGrael into a door jamb. (Barshaw Dep. at 31). The video shows Defendant McGrael rubbing his own shoulder but not rendering medical aid to Mr. Aparicio. (Video at 15:43; Barshaw Dep. at 33). Defendant McGrael realized that Mr. Aparicio needed medical assistance and he administered smelling salts to Mr. Aparicio. (Pl. Ex. 27, Internal Affairs Investigation, Doc. 166-19; Video at 21:56). Defendant McGrael asked Defendant Edwards, the supervisor, to call an ambulance. (Quintana Dep. at 47-48).

About eight minutes after Mr. Aparicio was tackled, Defendant Edwards started making telephone calls. (Video at 23:17). Within the following ten minutes, she made four more phone

6

calls. (Video at 24:25-34:00). Thirty minutes after Mr. Aparicio was tackled, emergency medical technicians arrived, and Mr. Aparicio was taken out on a stretcher. (Video at 25:00-40:42). According to Mr. Barshaw, when the emergency medical technicians arrived, Defendant McGrael referred to the Mr. Aparicio as a "fucking meth head" and blamed Mr. Aparicio for his broken collar bone. (Barshaw Dep. at 34).

Emergency medical personnel transported Mr. Aparicio to Mimbres Memorial Hospital. (Pl. Ex. 4, Office of the Medical Investigator (OMI) Report, Doc. 166-3). When Mr. Aparicio arrived back at the hospital, less than an hour after he had been medically cleared for detention, he had experienced a collapsed lung, brain anoxia, and cardio-pulmonary arrest. (*Id*.) Mr. Aparicio was transported to Mountain View Regional Medical Center in Las Cruces, where he died two weeks later. (*Id*.)

The OMI report states: "Mr. Aparicio's cardiac arrest occurred during/following restraint/a struggle, but since the exact role of the interaction in the death is unclear the manner of death is undetermined." (Pl. Ex. 4, Doc. 166-3). Plaintiff's expert witness, Werner U. Spitz, M.D., opined that the detention officers' use of the Taser and positional restraint caused Mr. Aparicio's death. (Pl. Ex. 6, Doc. 166-5). Defendant's expert witness, Gary M. Vilke, M.D., FACEP, FAAEM, opined that Mr. Aparicio died from cardiac arrest caused by methamphetamine induced excited delirium syndrome. (Def. Ex. M, Doc. 175-8).

Intoxicated and mentally ill people were booked into LCDC. (Edwards Dep. at 36-38). LCDC employees are trained to be nice to such people and to not yell at them. (*Id.* at 37-38; Pl. Ex. 15, Deposition of Sylvia Baeza at 14-15). If a person in LCDC custody refused to obey an order, detention officers were supposed to calm the inmate down, stay calm themselves, not yell

at an inmate, and call the supervisor on duty. (Baeza Dep. at 14-15; Edwards Dep. at 37-38). LCDC personnel were trained to know that pepper spray inhibits breathing. (McGrael Dep. at 57).

Defendant McGrael was responsible for dealing with all medical incidents at LCDC. (McGrael Dep. at 9-10). Defendant McGrael was not trained about positional asphyxia or the potential risks associated with prone position restraints. (*Id*. at 16). Defendant McGrael was trained to put people in the prone position to restrain them. (*Id*. at 21-22). Defendant McGrael's basic training consisted of watching forty hours of video tapes. (*Id.* at 11). As of December, 2012, Luna County had not updated those videos since they were purchased in 2002. (Pl. Ex. 20, FED. R. CIV. P. 30(b)(6) Luna County Dep. at 34). The videos do not include information about positional asphyxia. (*Id.* at 54).

Defendant Elford was not trained about positional asphyxia and he was trained to restrain people in the prone position. (Elford Dep. 86-87). The only thing Defendant Edwards remembered about training on positional asphyxia was to put people on their sides, and she could not recall any thing else she was taught about positional asphyxia. (Edwards Dep. at 92-94).

Training materials used to train LCDC detention officers on positional asphyxia consisted of a "short slide" at the end of a powerpoint presentation. (Rule 30(b)(6) Dep. at 47). The only training on positional asphyxia that was given to LCDC detention officers was not to place pressure on a subject's back or stomach and to place a subject on his left side or sit him up as soon as feasibly possible. (*Id.* at 50, 52). LCDC's warden, Defendant John Krehbiel never received any training in positional asphyxia, and he did not know what positional asphyxia was until December 11, 2012, the day before his deposition. (Pl. Ex. 29 at 97-98).

**IV.     Discussion**

**A.      Defendants are not entitled to summary judgment on the negligence claim**

In Count I, Plaintiff alleges Defendants were negligent by failing to maintain a safe and secure environment in the booking area. Defendants contend that this claim is barred by sovereign immunity. Plaintiff maintains that the claim fits within a statutory waiver of immunity.

The New Mexico Tort Claims Act grants governmental entities and their employees general immunity from actions in tort, but waives that immunity in certain specified circumstances. *See* N.M. STAT. ANN. § 41-4-4(A). The waiver for "operation or maintenance of any building" constitutes one such circumstance. *See* N.M. STAT. ANN. § 41-4-6. This waiver allows individual claims against governmental entities that are based on "the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." *Id.*

The New Mexico Supreme Court has embraced a broad view of the "operation or maintenance" aspect of Section 41-4-6. *Williams v. Cent. Consol. Sch. Dist.*, 952 P.2d 978, 981 (N.M. App. 1997). Under this broad interpretation, Section 41-4-6 requires the State "to exercise reasonable care to prevent or correct dangerous conditions on public property." Maintenance and operation of a correctional facility falls within the waiver afforded by Section 41-4-6. *Callaway v. N.M. Dep't of Corr.*, 875 P.2d 393, 399 (N.M. Ct. App. 1994). Section 41-4-6 applies where the negligence is "of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service or the users of the building, including the plaintiff." *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1265 (N.M. 2006).

In *Upton*, a child died as the result of an asthma attack that she suffered at school when a

9

substitute physical education teacher required her to participate in strenuous exercise. *Id.* at 1260. The child's parents had previously notified the regular physical education teacher and the school about the child's asthma. *Id.* Concluding that immunity had been waived under Section 41-4-6, the New Mexico Supreme Court reasoned that the plaintiffs had asserted more than negligent supervision and had challenged the school district's general failure to implement safety policies for at-risk students. *Id.* at 1263. The court distinguished a number of prior cases interpreting Section 41-4-6, and observed that the "key point [for application of Section 41-4-6] is that the negligence must be of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service or the users of the building, including the plaintiff." *Id.* at 1265. The plaintiffs' allegations in *Upton* fit within the waiver provision because "[f]ailure to respond appropriately to an emergency medical situation is a potential threat to every student in school because such a situation can occur at any time, regardless of special health needs." *Id. Upton* teaches that a governmental entity's failure to follow safety policies applicable to users of a public facility falls within the Section 41-4-6 waiver for operation or maintenance of a public building. In this case, LCDC failed to follow safety policies applicable to intoxicated or mentally ill detainees. Viewed in the light most favorable to Plaintiff, a jury could find that the actions of Defendants constitute negligence in the operation or maintenance of a building within the waiver of tort immunity set forth in Section 41-4-6.

**B.     Defendants are not entitled to summary judgment on the battery claim**

In Count V, Plaintiff alleges that after Mr. Aparicio became unresponsive, Defendants Elford and Chavez continued to apply weight and pressure to his neck and upper back while he was held in a prone position on his chest. Defendants assert that this claim is barred by the New

Mexico Tort Claims Act. Plaintiff responds that the claim falls within a statutory waiver of immunity.

>Section 41-4-12, the waiver for liability of law enforcement officers, provides:
>
>The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. STAT. ANN. § 41-4-12.

County detention center officers fall within the definition of law enforcement officers for purposes of Section 41-4-12. *Davis v. Bd. of Cnty Comm'rs of Doña Ana Cnty.*, 987 P.2d 1172, 1183 (N.M. Ct. App. 1999); *Methola v. Cnty. of Eddy*, 622 P.2d 234, 234 (N.M. 1980). The only issue with regard to Section 41-4-12 is whether the injured person suffered personal injury resulting from a battery caused by the negligence of law enforcement officers while acting within the scope of their duties. *Davis*, 987 P.2d at 1183. Plaintiff has presented evidence from which a jury could reasonably find that Defendants Elford and Chavez battered Mr. Aparicio. Viewed in the light most favorable to Plaintiff, a jury could find the actions of Defendants Elford and Chavez constitute battery within the waiver of tort immunity set forth in Section 41-4-12.

**C.     Defendants are not entitled to summary judgment on the excessive force claim**

In Count II, Plaintiff alleges that Defendants Elford, Chavez, and McGrael used excessive force on Mr. Aparicio while he was a pretrial detainee. Defendants move for summary judgment on this claim and cite to the Fourth Amendment in their initial brief and the Eighth Amendment in their reply brief. Plaintiff opposes the motion and points out that the Fourteenth Amendment

11

standard applies to the excessive force claim.

The record establishes that Mr. Aparicio was arrested and detained in a county detention center for an alleged probation violation and he had not been adjudicated to be in violation of his probation. (Doc. 152-2). The Tenth Circuit has explained that when a plaintiff is detained before an adjudication of guilt "neither the Fourth nor Eighth Amendment applies . . . [and] we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities." *See Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010).[1] In that Mr. Aparicio was in pretrial detention on a state probation revocation charge, the due process standard of the Fourteenth Amendment applies.

When determining whether force was excessive within the meaning of the due process standard of the Fourteenth Amendment, the Tenth Circuit focuses on three factors: "(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003). Construed in the light most favorable to Plaintiff, the record shows that Mr. Aparicio became extremely agitated in the booking cage. It was obvious that he was under the influence of methamphetamine. Defendant Elford escalated the situation by yelling at Mr. Aparicio, opening the door to the booking cage, and grabbing Mr. Aparicio. Mr. Aparicio became combative and pinned Defendant Chavez against the side of the cage. Defendant Elford pulled Defendant Chavez out of the booking cage, but the detention officers were unable to close

---

[1] The Fourth Amendment protects against unreasonable searches and seizures and its standard generally "pertains to the events leading up to and including an arrest of a citizen previously at liberty." *See Porro*, 624 F.3d at 1326. The Eighth Amendment standard applies to incarcerated persons whose guilt has been formally adjudicated. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1494 (10th Cir. 1990).

the door. Defendant Elford shot Mr. Aparicio three times with his Taser. Defendant Elford slammed Mr. Aparicio to the floor and other detention officers formed a "dog pile" on him. Defendants Elford and Chavez and other detention officers continued to restrain Mr. Aparicio in a prone position on his chest after he became unresponsive. Defendant McGrael was involved in the altercation and blamed Mr. Aparicio for his broken collar bone.

If proven, the facts of record would establish that the amount of force used exceeded the need presented and Mr. Aparicio was gravely injured as a result. Moreover, a jury could reasonably infer that Defendants Elford, Chavez, and McGrael were motivated by a desire to retaliate against Mr. Aparicio for pinning Defendant Chavez in the cage and injuring Defendant McGrael. Construing the factual record in the light most favorable to Plaintiff leads to the conclusion that Plaintiff has put forth evidence that gives rise to a jury question regarding the relationship between the amount of force used and the need presented, the extent of the injury inflicted, and the motives of the Defendants Elford, Chavez, and McGrael.

**D.     Defendants are not entitled to summary judgment on the deliberate indifference claim**

In Count III, Plaintiff asserts that Defendant McGrael was deliberately indifferent to Mr. Aparicio's serious medical needs. Defendant McGrael moves for summary judgment on this claim on the ground that he was not deliberately indifferent to serious medical needs. Plaintiff responds that material facts remain in dispute.

"Under the Fourteenth Amendment due process clause, pretrial detainees are entitled to the degree of protection against denial of medical attention which applies to convicted inmates under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)

13

(ellipses and quotation omitted).  Deliberate indifference "involves both an objective and a subjective component."  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quotation omitted).  For the objective component, an inmate must provide "evidence that the deprivation at issue was in fact sufficiently serious."  *Id.* (quotation omitted).  The subjective component requires "evidence of the prison official's culpable state of mind," which may be fulfilled by showing that the official "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference."  *Id.* (brackets and quotation omitted).  This "standard lies somewhere between the poles of negligence at one end and purpose or knowledge at the other."  *Id.* at 752 (quotation omitted).

    The deprivation of the ability to breathe was objectively serious.  It should have been obvious to Defendant McGrael that, based on Mr. Aparicio's intoxication, agitated behavior, and forceful struggle, he was at risk for positional asphyxiation.  *See Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir. 2008) (maintaining suspect in prone position on stomach for three minutes after he was handcuffed and his legs bound was unreasonable); *Cruz v. City of Laramie*, 239 F.3d 1183, 1188-89 (10th Cir. 2001) (holding a trained police officer should have realized that pressure on the chest was likely to cause positional asphyxia to an agitated suspect).

    Construed in the light most favorable to Plaintiff, the evidence of record shows that Defendant McGrael stood by while Mr. Aparicio was asphyxiated and failed to render medical assistance other than the administration of smelling salts.  Defendant McGrael did not timely request medical assistance and referred to Mr. Aparicio as a "fucking meth head" when emergency medical technicians arrived.  Plaintiff has put forth evidence that gives rise to a jury

14

question as to whether Defendant McGrael was deliberately indifferent to Mr. Aparicio's serious medical needs.

**E.     Defendants are not entitled to summary judgment on the due process claim**

In Count IV, Plaintiff asserts that the actions of Defendants Elford, Chavez, and McGrael violate substantive due process. Defendants move for summary judgment on this claim on the grounds that it is subsumed in the other constitutional claims and their conduct does not shock the conscience. It bears underscoring that the due process clause of the Fourteenth Amendment prohibits "executive abuse of power . . . which shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). "Force inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment." *Roska*, 328 F.3d at 1243. The Tenth Circuit has explained:

> The ultimate standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges. It is well settled that negligence is not sufficient to shock the conscience. In addition, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.

*Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222 (10th Cir. 2006). Construed in the light most favorable to Plaintiff, Defendant McGrael stood by as Defendants Elford and Chavez continued to restrain Mr. Aparicio in a prone position on his chest while placing weight and pressure on his neck for several minutes after he became unresponsive. Based on this evidence, a fact finder could determine that the conduct of Defendants Elford, Chavez, and McGrael amounted to an abuse of power that shocks the conscience.

## F.     Defendants are not entitled to summary judgment on the failure to train and supervise claim

In Count VI, Plaintiff asserts that Defendant Edwards failed to supervise Defendants Elford, Chavez, and McGrael and Defendants John Krehbiel and Luna County failed to train jail employees. Defendants move for summary judgment on both aspects of this claim, contending that *respondeat superior* is inapplicable and LCDC policies did not cause the constitutional violations.

Supervisory liability requires (1) an underlying constitutional violation by a subordinate and (2) the supervisor's personal direction or actual knowledge and acquiescence in the violation. *J.W. v. Utah*, 647 F.3d 1006, 1012 (10th Cir. 2011); *Serna v. Colo. Dept. of Corr.*, 455 F.3d 1146, 1151-52 (10th Cir. 2006). Defendant Edwards was present during the incident yet she failed to intervene and she did not call emergency medical technicians in a timely manner. Construed in the light most favorable to Plaintiff, the record establishes that Defendants Elford, Chavez, and McGrael committed constitutional violations in the presence of Defendant Edwards, their direct supervisor, and Defendant Edwards acquiesced to their conduct. Based on this evidence, a fact finder could determine that Defendant Edwards personally participated and acquiesced to the constitutional violations.

Plaintiff alleges that the constitutional violations were caused by the failure of Defendants Krehbiel and Luna County to properly train the detention officers at LCDC. To prevail on a claim based on a failure to adequately train officers, a plaintiff must establish circumstances constituting a usual and recurring situation with which officers must deal; inadequate training demonstrating a deliberate indifference toward persons with whom the officers have contact; and a direct causal

link between the constitutional deprivation and the inadequate training. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 841-42 (10th Cir. 1997). LCDC detention officers were not trained about the danger of positional asphyxia. Construed in the light most favorable to Plaintiff, the record shows that intoxicated and mentally ill people were detained at LCDC, Defendants received inadequate training demonstrating a deliberate indifference toward such at risk detainees, and the inadequate training caused the constitutional deprivations. If proven, a jury could reasonably infer from these facts that Defendants Krehbiel and Luna County were aware of a serious risk of constitutional violations, and that their failure to take any action in response to the problem was the result of deliberate indifference. The Court finds that there are sufficient factual issues that are best decided by a jury with regard to failure to train, and summary judgment as to this claim is denied.

### G.     Defendants are not entitled to qualified immunity

Defendants contend that they are entitled to qualified immunity and summary judgment on Plaintiff's claims. Section 1983 provides that "[e]very person" who acts under color of state law to deprive another of constitutional rights "shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable officer would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In contrast to a standard motion for summary judgment, which places the burden on the moving party to point out the lack of any genuine issue of material fact for trial, a motion based on a claim of qualified immunity imposes the burden on the plaintiff to show "both that a constitutional

17

violation occurred and that the constitutional right was clearly established at the time of the alleged violation." *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009) (internal quotations omitted). If either of these requirements is not met, the defendant is entitled to qualified immunity and summary judgment is appropriate.

As more fully discussed in the context of each §1983 claim, Plaintiff has presented evidence sufficient to create disputes of material fact as to whether constitutional violations occurred. Taken in the light most favorable to Plaintiff, the facts of record show Defendants' conduct violated Mr. Aparicio's constitutional rights. Thus, Plaintiff has satisfied the first requirement to overcome Defendants' assertion of qualified immunity.

Additionally, Plaintiff has shown that the right was clearly established. In order "for a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1108 (10th Cir. 2008). General propositions of law are insufficient. *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S. Ct. 2074, 2084 (2011). Specifically, with regard to the excessive force claim, Plaintiff has shown that, on March 3, 2011, it was clearly established that the Fourteenth Amendment barred detention officers from using excessive force on a pretrial detainee. *Roska*, 328 F.3d at 1243; *Cruz*, 239 F.3d at 1188; *Weigel*, 544 F.3d at 1154-55. As to the deliberate indifference claim, Plaintiff has shown that at the time of the incident it was clearly established that a detention officer could not withhold medical treatment for a serious medical need of a pretrial detainee. *Martinez*, 563 F.3d at 1088; *Mata*, 427 F.3d at 751. Additionally, with respect to the due process claim, Plaintiff has shown that it was clearly established on the date of the incident that the continued restraint of an

unresponsive pretrial detainee shocks the conscience.  *Roska*, 328 F.3d at 1243 ("Force inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment.").  Finally, it was clearly established at the time of the incident that a supervisor's actual knowledge and acquiescence to a constitutional violation and inadequate training demonstrating a deliberate indifference toward persons with whom the officers have contact would result in supervisory liability.  *See Serna*, 455 F.3d at 1151-52; *Allen*, 119 F.3d at 841-42.  Plaintiff has shown both that constitutional violations occurred and that the constitutional rights were clearly established at the time of the alleged violation. Defendants are not entitled to qualified immunity.

    **THEREFORE,**

    **IT IS ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Second Amended Complaint (Doc. 152) is DENIED.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**